**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: ___________________**

ARIEL GLAZER, individually and on behalf of all others similarly situated,

Plaintiff,

v. JURY TRIAL DEMANDED

COSTCO WHOLESALE CORPORATION, a Washington corporation,

Defendant.
_____________________________________/

## NATIONWIDE CLASS ACTION COMPLAINT

Plaintiff, Ariel Glazer ("Plaintiff"), brings this class action against Defendant, Costco Wholesale Corporation ("Defendant"), on behalf of all consumers that have purchased falsely labelled and marketed tequila from Defendant's Kirkland Signature brand tequila.

## I. INTRODUCTION

1. In the world of tequila, the *tequilana weber* blue variety of agave ("Blue Weber agave") is regarded as the gold standard. Indeed, the Blue Weber agave variety is the sole variety used in the production of true tequila. Blue Weber agave is native to Jalisco, Mexico and certain surrounding areas.

2. Blue Weber agave production is highly regulated, and consumers pay a premium for agave spirits made from 100% Blue Weber agave as a result. By way of example, Blue Weber agave takes longer to harvest because it must be grown and harvested once the plants reach full maturity (which can take 5 to 10 years). The plants must also be grown and harvested within certain areas, and specific traditional harvesting practices must be employed. These restrictions are enforced by the Tequila Regulatory Council and are meant to protect the authenticity and quality

of tequila and ensure that tequila produced outside the designated geographic regions cannot be labeled as such.

3. Tequila is made from the heart of the Blue Weber agave plant, commonly referred to as the piña. The piña is heated to break down its complex sugars, and crushed to extract its sugary juice, which is then fermented with yeast, transforming those sugars into agave-derived ethanol (alcohol), which is distilled into tequila.

4. Defendant sells at least five agave spirits under the Kirkland Signature brand that Defendant labels and markets as "100% DE AGAVE" and as "100% AGAVE AZUL" from Jalisco, Mexico on the face of the bottles: Blanco, Reposado, Añejo, Añejo Cristalino, and Extra Añejo (collectively "Kirkland Tequila," "Kirkland Tequilas" or the "Products").[1] All of the Products begin with the initial distillation of Kirkland Signature Tequila Blanco, which serves as the foundation for the entire line of Kirkland Signature Tequilas.

[1] *See, e.g.,* Costco Wholesale Same-Day, Kirkland Signature Tequila Blanco, https://sameday.costco.com/store/costco/products/30489048-kirkland-signature-tequila-blanco-1-75-l (last visited Oct. 31, 2025); Costco Wholesale Same-Day, Kirkland Signature Tequila Reposado, https://sameday.costco.com/store/costco/products/30352534-kirkland-signature-mexico-reposado-tequila-1-l (last visited Oct. 31, 2025); Costco Wholesale Same-Day, Kirkland Signature Tequila Añejo, https://sameday.costco.com/store/costco/products/20720515-kirkland-signature-anejo-mexico-tequila-1-l (last visited Oct. 31, 2025);Costco Wholesale Same-Day, Kirkland Signature Tequila Añejo Cristalino, and https://sameday.costco.com/store/costco-spirits/products/48933775-kirkland-signature-cristalino-mexico-tequila-1-l (last visited Oct. 31, 2025); Costco Instacart, Kirkland Signature Tequila Extra Añejohttps://www.instacart.com/products/82410769-kirkland-signature-tequila-extra-aejo-mexico-1-l?retailerSlug=costco&sisid=29603 (last visited Oct. 31, 2025).


KIRKLAND
TEQUILA BLANCO
100% DE AGAVE
KIRKLAND
TEQUILA REPOSADO
Barrel Aged
100% DE AGAVE
KIRKLAND
TEQUILA AÑEJO
Extra Aged
100% DE AGAVE




5. In addition to selling the Products in its vast chain of retail brick and mortar stores, Defendant also sells the Products online, directing customers who wish to purchase bottles of Kirkland Tequila to the Costco Wholesale Same-Day website powered by Instacart, which allows customers to purchase Kirkland Tequilas for prices between $18.69 and $48.99 per bottle.[2]

6. Defendant represents on the face of its bottles that the Products are "Hecho en Jalisco, Mexico," which in English means "made in Jalisco, Mexico."[3]

[2] *See id.*
[3] *See id.*

7. Defendant further represents on the face of its bottles that the Products are made "using 100% Blue Agave." By way of example, the label for the Kirkland Reposado represents, "This very special Reposado tequila is a blend of tequila rested in American & French oak using 100% Blue Agave. Salud!"

8. Upon information and belief, even if Defendant were able to sell these products as a "mixto" tequila, *i.e.*, tequila that is *not* 100% agave, they would do so at a materially lower price, because other forms of alcohol are materially less expensive than that derived from Blue Weber agave. As demonstrated below, at least some of the Products would not even qualify as a mixto under Mexico's tequila specifications. *See* para. 23, *infra.*

9. Plaintiff and others similarly-situated paid premium prices for the Products in reliance on Defendant's representations that the Products were created from 100% Blue Weber agave.

10. Specialized testing of the Products, utilizing a peer-reviewed and scientifically-validated methodology, has uncovered that they contain material amounts of ethanol *not derived from agave plants*, and, as such, they were adulterated with ethanol other than that obtained from Blue Weber agave.

11. If Plaintiff and others similarly situated had known the truth of the ingredients in the Products, they would not have purchased the Products or would have paid less for them, and still hope to purchase these products in the future when they are truly 100% agave. For these reasons, and as further detailed below, Plaintiff brings this claim on her own behalf and on behalf of other consumers of Defendant's Products.

## II. PARTIES

**Plaintiff**:

12. Plaintiff is a resident and citizen of Florida and is otherwise *sui juris*. As detailed below, Plaintiff purchased various Products from liquor stores authorized to sell the Products in Florida. By way of example, on October 28, 2025, Plaintiff purchased a bottle of Kirkland Reposado from a Costco Wholesale liquor store in Royal Palm Beach, Florida. *A true and correct copy of Plaintiff's receipt for this transaction is attached as Exhibit A.*[4]

13. Plaintiff purchased these Products after reviewing the Products' labels in store and at private events that offered the Products. Plaintiff purchased these Products, in material part, because they purportedly were "100% Blue Agave." Prior to purchase, Plaintiff read and relied on Defendant's representation that the Products were "100% Blue Agave." When Plaintiff purchased the Products, she was unaware that Defendant had misrepresented the composition and ingredients of the Products, such that she would not have purchased the Products or would not have paid as much for them as she did. Plaintiff, at all times, believed, as a result of Defendant's representations both online and on the packaging of the Products she purchased, that the tequila she purchased was premium and pure tequila made of 100% Blue Weber agave. Had Plaintiff known the Products were not 100% Blue Weber agave, she would not have purchased the Products or would have paid less than she did.

**Defendant**:

14. Defendant Costco Wholesale Corporation ("Costco") is a Washington corporation headquartered in Issaquah, Washington that solicits and/or facilitates the manufacturing, and then

---

[4] For security and to avoid misuse of this information, Plaintiff's Costco "UH Member" number has been partially redacted.

markets and sells the Products at issue in this litigation. Defendant Costco engages in business throughout the United States.

## III. JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this class action under 28 U.S.C. § 1332(a)(1) because Plaintiff has a good-faith basis for an amount in controversy that exceeds the sum or value of $75,000, exclusive of interest and costs, and because the matter is between citizens of different states. In addition, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2)(A) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more proposed class members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is diversity because Plaintiff and Defendant are citizens of different states.

16. This Court has personal jurisdiction over Defendant because it has substantial aggregate contacts with this District, including engaging in conduct in this District that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including by marketing and selling the Products to consumers in this Judicial District, by placing the Products into the stream of commerce directed at this Judicial District, and because Defendant purposely availed itself of the laws of the State of Florida by marketing and distributing the Products within Miami-Dade County, Florida and the State of Florida. Defendant's purposeful availment and extensive contacts with Florida renders the exercise of jurisdiction by this Court over it permissible under traditional notions of fair play and substantial justice.

17. In accordance with 28 U.S.C. § 1391, venue is proper in this District because Defendant transacts business within this District and Defendant has intentionally availed itself of the laws and markets within this District.

18. All conditions precedent to this action have occurred, been performed, or have been waived.

## IV. FACTUAL ALLEGATIONS

19. ***Defendant and the Tequila Market.*** Tequila's popularity among consumers stems from several factors including (i) its versatility; (ii) its perception as a "healthier," "cleaner," and/or more "natural" choice than other spirits; (iii) a growing trend of consumers seeking authentic and premium beverage experiences; and (iv) its cultural connection to Mexico.

20. ***The Regulation of Tequila Manufacturing and Labeling.*** Like champagne and cognac, tequila is a product of *origin*. Tequila can only legally be made in Mexico: specifically, in the states of Jalisco, Tamaulipas, Nayarit, Michoacán and Guanajuato. Mexico's Tequila Regulatory Council, *Consejo Regulador del Tequila, A.C.* ("CRT"), the Conformity Assessment Body for NOM-006-SCFI-2012-Alcoholic Beverages-Tequila-Specifications ("Tequila NOM") regulates the manufacturing of tequila.[5]

21. The Tequila NOM in section 6.1.1.1 states that the addition of sugar-based syrups "must not be more than 1% in relation to the total Tequila weight before it is bottled."

22. Under section 5.1.1 of the Tequila NOM, a product labeled "100% agave [azul]" or "100% de agave" is "a product whose fermentation may not be enhanced with sugars other than those obtained from the *tequilana weber* blue variety Agave grown in the territory specified in the Declaration" (*i.e.*, in the states of Jalisco, Tamaulipas, Nayarit, Michoacán and Guanajuato).

23. "100% agave" tequila, as expressly defined in NOM § 5.1.1 is different from "Tequila" as defined in NOM § 5.1.2. A key distinguishing difference between 100% agave

[5] *Official Mexican Standard NOM-006-SCFI-2012 Alcoholic Beverages -Tequila - Specifications Courtesy Translation*, https://www.crt.org.mx/wp-content/uploads/2024/01/NOM-006-SCFI-2012%20-%20INGLES.pdf (last visited Oct. 31, 2025).

tequila and "tequila" is that "tequila" may have "other sugars in a proportion not to exceed 49% of total reducing sugars expressed in units of mass. This maximum enhancement of up to 49% of total reducing sugars expressed in units of mass may not be done with sugars from any species of Agave." However, "[t]he 51% of total reducing sugars expressed in units of mass may only be enhanced with *tequilana weber* blue variety agave . . . ." *See also* NOM § 6.3 (only authorizing mixto tequila that is not 100% agave azul from being "enhanced with other sugars in the fermentation process").

24. As such, to be labeled as "100% agave," "100% de agave," "100% puro de agave," "100% agave," or "100% puro agave" (inclusive of any combination of these labels with the word "azul" ["blue"]) the product *may not be enhanced with sugars* other than those obtained from the *tequilana weber* blue variety of agave grown in a specific, defined territory.

25. In short, no sugars other than those obtained from the *tequilana weber* blue variety should be found in a tequila labeled as 100% agave.

26. Lastly, section 6.5.2.1 requires strict documentation to ensure that tequila "has not been adulterated in the manufacturing stages of its production."

27. A tequila labeled as 100% agave will be deemed to have been adulterated in the manufacturing stages of its production if it was not made exclusively from Blue Weber agave sugars. The presence of other sugars impacts the tequila's quality and taste given that the use of other sugars can alter the natural flavor profile of tequila.

28. Bottles of agave spirits that fail to provide accurate information in interstate commerce violate the Federal Alcohol Administration Act ("FAAA"), 27 U.S.C. § 205(e), which requires bottles to provide the "identity and quality of the products" and "the alcoholic content thereof," and 27 U.S.C. § 205(f), which requires advertisements of distilled spirits to "provide the consumer with adequate information as to the identity and quality of the products advertised."

29. Tequila is additionally regulated in the United States by the U.S. Department of the Treasury, Alcohol and Tobacco Tax and Trade Bureau pursuant to 27 C.F.R. Part 5, which regulates the labeling and advertising of distilled spirits.

30. An agave spirit can only be categorized as tequila where it is "made in Mexico, in compliance with the laws and regulations of Mexico governing the manufacture of Tequila for consumption in that country." 27 C.F.R. § 5.148.

31. A distilled spirit made from agave plants may only contain added flavoring or coloring materials if they "do not total more than 2.5 percent by volume of the finished product." 27 C.F.R. § 5.155.

32. ***Widespread Reports of Tequila Adulteration.*** As reported by mezcalistas.com, "[a] traditional blanco tequila doesn't rely on aging or infusions for its alluring and distinctive flavors, which are derived solely from agave, the water source, and the craft of fermentation and distillation. But blue weber agave takes a long time to mature — five to 10 years — and that creates ongoing tension in the industry, as well as the temptation to cut corners."[6]

33. Remberto Galván Cabrera, the official spokesperson for the Mexican Agave Council (Consejo Mexicano del Agave or CMXDA), an organization that advocates for the rights of agaveros and transparency in the tequila industry, has explained that "when agave prices were high, large tequila companies began mixing cane alcohol into tequila that they sold as 100% agave."[7] This practice remains ongoing.[8]

---

[6] Felisa Rogers, *What are you drinking? Agave farmers allege tequila industry corruption*, Mezcalistas (Jan. 13, 2025), https://www.mezcalistas.com/tequila-industry-corruption/ (last visited Oct. 31, 2025).
[7] Felisa Rogers, *Agave farmers say they will no longer play nice*, Mezcalistas (Jan. 15, 2025), https://www.mezcalistas.com/breaking-tequila-news/ (last visited Oct. 31, 2025).
[8] *See id.*

34. Consumers have also raised their suspicions that there is significant adulteration of tequila that is exported from Mexico through social media, community-driven forum-style websites, and blind tasting tests.

35. ***Nuclear Magnetic Resonance Testing Confirms Adulteration of the Products.*** To verify the falsity of Defendant's representations, Plaintiff commissioned Nuclear Magnetic Resonance ("NMR") laboratory testing to confirm, by way of carbon isotope ratio analysis, whether the Products purchased by Plaintiff have been adulterated with cane alcohol.

36. This sophisticated, scientific technique is widely accepted in food chemistry and has been recognized for its reliability in discerning the authenticity of 100% agave tequila in multiple peer-reviewed publications (including publications supported by the CRT) and by Mexico's *Centro Nacional de Metrología* ("CENAM," Mexico's national reference laboratory for measurements).[9] NMR testing identifies the plant origin of ethanol in a spirit by measuring the natural carbon fingerprint of the ethanol in the spirit. This fingerprint—known as a stable carbon isotope ratio ($\delta^{13}C$) –can be used to identify the plant source of the sugars used in fermentation.

37. Specifically, the carbon composition is analyzed at two parts of the ethanol molecule: the methylene group ($CH_2$) and the methyl group ($CH_3$). Ethanol made from Blue Weber

[9] *See, e.g.* Warren-Vega, W. M., Fonseca-Aguinaga, R., Gonzalez-Gutiérrez, L. V., & Romero-Cano, L. A. (2023). *A critical review on the assessment of the quality and authenticity of Tequila by different analytical techniques: Recent advances and perspectives. Food Chemistry, 408*, 135223; Portaluri, V., Thomas, F., Jamin, E., Akoka, S., & Remaud, G. S. (2021). *Authentication of agave products through isotopic intramolecular 13C content of ethanol: Optimization and validation of 13C quantitative NMR methodology. ACS Food Science & Technology, 1*(8), 1316–1322; and Centro Nacional de Metrología (CENAM). (2022). *Informe final de ensayo de aptitud CNM-EA-630-0014/2022: Identificación de origen de bebidas de agave*. El Marqués, Querétaro, México: CENAM.

agave, a CAM49 plant, shows a distinct isotope signature compared to cheaper feedstocks like corn or sugarcane, which are $C_4$ plants.[10]

38. A foundational 2010 study confirmed this distinction and the ability to differentiate authentic 100% agave tequila when applying the analysis to tequila products. When applied to tequila, this technique detects the adulteration of tequila labeled as 100% agave by identifying the presence of ethanol made from a source other than Blue Weber agave. By way of example, ethanol made from $C_4$ plants such as corn and sugarcane consistently shows $\delta^{13}C(CH_2)$ values near –13.5‰.[11] In contrast, agave-derived ethanol falls within a range of –7.0‰ to –9.0‰.[12]

39. NMR testing confirms that Defendant is selling tequila that does not meet the United States' or Mexico's regulatory requirements for tequila labeled as 100% agave. Specifically, NMR testing of Kirkland Signature Añejo Cristalino revealed a $\delta^{13}C(CH_2)$ value of -13.3 (± 0.5)‰. As such, the isotopic parameters measured were not in agreement with the tested samples' description of 100% agave, and even worse, fell outside the required parameters for "mixto" tequilas as well.

40. These testing results for Kirkland Signature Añejo Cristalino implicates the entire range of the Products as they are created from the same base spirit.[13]

41. Plaintiff purchased the Products based on Defendant's representations and would not have paid premium prices but for Defendant's false and misleading statements and omissions.

42. Plaintiff intends to purchase Defendant's Products again under the current labeling once she understands the products to truly contain 100% agave and seek the Court's assistance by

---

[10] *See* Freddy Thomas, et al., *Improved Characterization of the Botanical Origin of Sugar by Carbon-13 SNIF-NMR Applied to Ethanol*, 58 J. AGRIC. FOOD CHEM. 11580, 11580-81 (2010).
[11] *Id.* at 11583.
[12] *Id.*
[13] All products within the Kirkland Signature Tequila line are derived from the same base spirit. According to Defendant, the Añejo Cristalino product has been aged and filtered.

way of injunctive relief to ensure that Defendant's representations regarding its Products are accurate.

## V. TOLLING ALLEGATIONS

43. Plaintiff and other Class members reasonably relied on Defendant's representations and could not have discovered, through the exercise of reasonable due diligence, that Defendant was misrepresenting and concealing the true nature of the Products.

44. On or about January 13, 2025, agave spirit journalist Felisa Rogers with *Mezcalistas.com* published the English-language article, *Is that really tequila you're buying? Allegations of corruption raise serious questions*.[14] This article covered the prior week's large-scale, peaceful protest by agave farmers in the historic central square of Tequila, Jalisco, where members of the Mexican Agave Council, and *agaveros* (agave farmers) from several states convened to make demands on the tequila industry, including *inter alia:* "*NO MAS TEQUILA ADULTERADO!!!*" (translation- NO MORE ADULTERATED TEQUILA!!!), and "*EL TEQUILA DEVE SER 100 % AGAVE!!*" (translation-TEQUILA MUST BE 100% AGAVE!!").[15]

[14] Felisa Rogers, *Agave farmers say they will no longer play nice*, Mezcalistas (Jan. 15, 2025), https://www.mezcalistas.com/breaking-tequila-news/. (last visited Oct. 31, 2025)
[15] *Id.*



*Hundreds of protesters gathered to protest alleged tequila industry corruption*

45. Only after that public protest and the subsequent coverage by *Mezcalistas* and other trade publications, could Plaintiff or other Class members reasonably have learned of the adulteration of purported 100% agave tequila with other forms of alcohol.

46. For these reasons, the applicable statutes of limitations for all claims should be tolled until at least January 13, 2025.

## VI. CLASS ALLEGATIONS

47. Plaintiff brings this action individually and as representatives of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined classes:

**A. The Nationwide Class:** All persons in the United States who purchased one or more of the Products during the applicable statute of limitations period.

**B. The Florida Subclass:** All persons who purchased one or more of the Products in Florida during the applicable statute of limitations.

48. Excluded from each class are Defendant, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; the judicial officers and their immediate family members and

associated court staff assigned to this case; and persons who properly execute and file a timely request for exclusion from the Class.

49. The classes described in this Complaint may be jointly referred to as the "Class" or "Classes" and members of the proposed classes may be jointly referred to as "Class members." Plaintiff reserves the right to amend or modify the Class definitions with greater specificity, further division into subclasses, or with limitation to particular issues as discovery and the orders of this Court warrant. In addition, the Court can define the Classes and create additional subclasses as may be necessary or desirable to adjudicate common issues and claims of the Class members if, based on discovery of additional facts, the need arises.

50. Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief and damages appropriate with respect to the Classes as a whole. Defendant continues to falsely market the Products as tequila made from 100% agave despite using sugars that were not derived from the Blue Weber agave variety.

51. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

52. As set forth in detail below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

**Numerosity/Manageability**

53. This action satisfies the requirements of Rule 23(a)(1). The members of the Class are so numerous that individual joinder of all Class members is impracticable. On information and belief, Class members number in the thousands. Defendant sells at least tens of thousands of cases of its tequila Products each year. The precise number or identification of members of the Class is

presently unknown to Plaintiff but may be ascertained from (i) Defendant's books and records, (ii) the books and records of third-party retailers that maintain records of Class member purchases and contact information, and (iii) industry statistics. By way of example, upon information and belief, Florida is the third largest consumer of tequila in the United States.[16]

54. Plaintiff anticipates providing appropriate notice to Class members in compliance with Rule 23. By way of example, Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, email, text messages, social media, online advertisements, and/or published notice.

**<u>Commonality</u>**

55. This action satisfies the requirements of Rule 23(a)(2) and 23(b)(3) because there are questions of law and fact that are common to each member of the Classes. These common questions predominate over any questions affecting only individual Class members. The predominating common or Class-wide fact questions include, without limitation:

a. Whether Defendant's marketing of its tequila Products was likely to deceive or mislead reasonable consumers;

b. Whether Defendant was negligent in marketing its Products as 100% de agave;

c. Whether Defendant engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices by marketing their Products as 100% de agave;

d. Whether Defendant was unjustly enriched;

e. Whether Defendant violated the consumer protection statutes and common law causes of action alleged herein; and

f. Whether damages, restitution, equitable, injunctive, declaratory, or other relief is warranted.

---

[16] Jan Conway, *U.S. Tequila Consumption 2023, By State*, Statista (Feb. 13, 2025), https://www.statista.com/statistics/486797/tequila-consumption-united-states-by-state/#:~:text=In%202023%2C%20tequila%20consumption%20in,ranking%20second%20and%20third%20respectively.&text=Tequila%2C%20an%20agave%2Dbased%20distilled,beverages%20in%20the%20United%20States. (last visited Oct. 31, 2025)

**Typicality**

56. This action satisfies the requirements of Rule 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same wrongful conduct of Defendant.

57. Each Class member purchased one or more of Defendant's Products and thus as a result has sustained, and will continue to sustain, damages in the same manner as Plaintiff. The relief Plaintiff seeks in this action is typical of the relief sought for the absent Class members.

**Adequacy of Representation**

58. This action satisfies the requirements of Rule 23(a)(4). Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is committed to the vigorous prosecution of this action and there is no hostility or conflict between or among Plaintiff and the unnamed Class members. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

59. To prosecute this case, Plaintiff has chosen the undersigned law firm, who has substantial experience in the prosecution of large and complex class action litigation and has the financial resources to meet the costs associated with the vigorous prosecution of this type of litigation. Plaintiff and her counsel will fairly and adequately protect the interest of all Class members.

**Superiority/Predominance**

60. This action satisfies the requirements of Rule 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members. The joinder of individual Class members is impracticable because of the vast number of Class members who own or have purchased any of the Products.

61. Because the monetary damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to Defendant, by even a small fraction of the Class members, would be enormous.

62. In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member. The benefits to the legitimate interests of the parties, the court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is simply superior to other alternative procedures for handling the class action given the particular circumstances.

63. Plaintiff is unaware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. The damages or other financial detriment suffered by Plaintiff and the Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Rule 23 provides the Court

with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.

## VII. CLAIMS FOR RELIEF

### COUNT I – COMMON LAW NEGLIGENCE
**(On behalf of Plaintiff and the Nationwide Class against Defendant)**

64. Plaintiff incorporates by reference paragraphs 1 through 63 as though fully set forth herein.

65. Defendant had a duty to accurately label, advertise and market the Products.

66. Defendant owed Plaintiff and the Nationwide Class the duty of reasonable care, which it breached.

67. Specifically, Defendant owed a duty to Plaintiff and the Nationwide Class members to disclose that the Products are not 100% agave and further owed a duty to ensure that the Products were not adulterated.

68. Defendant breached the duty owed to Plaintiff and the Nationwide Class in intentionally concealing material facts regarding the true nature of the Products, making misleading representations regarding the nature of the Products, and otherwise failing to disclose the same.

69. Defendant's knowing, intentional, or otherwise reckless misrepresentations and omissions were material in that a reasonable consumer would have considered them important in deciding whether to purchase the Products. Indeed, Plaintiff reviewed, considered, and relied on Defendant's representations that the Products were 100% agave in deciding whether to purchase them. Plaintiff and the Nationwide Class members' reliance was reasonable.

70. Absent Defendant's misrepresentations and omissions, Plaintiff and the Nationwide Class members would not have purchased the Products or would not have paid premium prices for the Products.

71. As a result of Defendant's breach of its legal duties, Plaintiff and the Nationwide Class members suffered actual damages, that arose from the natural and foreseeable consequences of Defendant's conduct, in that the adulterated Products were not 100% agave, and, therefore, were not worth the premium price Plaintiff and Nationwide Class members paid.

**COUNT II – NEGLIGENT MISREPRESENTATION**
**(On behalf of Plaintiff and the Nationwide Class against Defendant)**

72. Plaintiff incorporates by reference paragraphs 1 through 63 as though fully set forth herein.

73. Defendant represented on the faces of the bottles and elsewhere that they used 100% Blue Weber agave to create the Products by representing that the Products were "100% DE AGAVE" and made using "100% Blue Agave."

74. Defendants misrepresent on its Products' bottle labels in no less than two separate places that the Products contain 100% agave ("100% Blue Agave" and / or "100% DE AGAVE").

75. Defendant has continued to make these misrepresentations of material facts to date.

76. At the time, Defendant either knew or should have known it was making misrepresentations of material facts or made the representations without knowledge of their truth or falsity.

77. Defendant's misrepresentations were made with the intent to induce consumers to purchase its tequilas over their competitors' tequila products who did not offer 100% agave tequilas.

78. These misrepresentations of fact concerned the type of information upon which Plaintiff and other reasonable consumers would be expected to rely in making their decisions to purchase Defendant's Products.

79. Consequently, Plaintiff and the Nationwide Class have suffered injury by purchasing Defendant's Products and not receiving what was advertised.

**COUNT III – UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Nationwide Class against Defendant)**

80. Plaintiff incorporates by reference paragraphs 1 through 63 as though fully set forth herein.

81. Plaintiff and the Nationwide Class members conferred benefits upon Defendant.

82. Plaintiff and the Nationwide Class members paid money for the Products, which they would not have purchased or would not have purchased at the same price, had they known that they were enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave.

83. Defendant has unjustly retained the benefits conferred upon by Plaintiff and the Nationwide Class members.

84. Defendant retained those benefits under circumstances that make it inequitable for Defendant to retain such benefits.

85. Defendant retained these benefits even though the Products were enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave.

86. If Plaintiff and Nationwide Class members had known the true nature of the Products, they would not have purchased the Products.

**COUNT IV – VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), FLA. STAT. § 501.201 *ET SEQ*.**
**(On behalf of Plaintiff and the Florida Subclass against Defendant)**

87. Plaintiff incorporates by reference paragraphs 1 through 63 as though fully set forth herein.

88. Plaintiff and the Florida Subclass members are "consumer[s]" engaged in "trade or commerce" within the meaning of FDUTPA. § 501.203 (7), (8), Fla. Stat.

89. Defendant engaged in "trade or commerce" within the meaning of FDUTPA. § 501.203(8), Fla. Stat.

90. FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat.

91. Defendant engaged in unfair and deceptive trade practices that violated FDUTPA, by representing that their Products were 100% de agave tequila made of 100% Blue Weber agave.

92. Defendant knew or should have known that its representations of the nature and composition of its Products were false but failed to disclose this information to consumers.

93. Defendant knew that such information was material to consumer transactions and consumers' decisions to purchase the Products.

94. Defendant actively concealed and misrepresented the true nature of how its Products were manufactured and composition of their Products. Indeed, Defendant concealed and misrepresented that it had in fact utilized sugars other than those obtained from the *tequilana weber* blue variety of agave to enhance its tequila, despite the Products being labeled as 100% de agave.

95. Defendant intended for Plaintiff and the Florida Subclass members to rely on its misrepresentations and omissions so that Plaintiff and the Florida Subclass members would purchase the Products.

96. Defendant's unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the composition of the Products had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact, deceive reasonable consumers, including Plaintiff and the Florida Subclass members, about the quality and true value of the Products.

97. Defendant intentionally and knowingly misrepresented or omitted material facts regarding the use of Blue Weber agave with an intent to mislead Plaintiff and the Florida Subclass members into believing that 100% Blue Weber agave was used to ferment the Products.

98. Defendant knew or should have known that its conduct violated FDUTPA.

99. Plaintiff and the Florida Subclass members were and are injured as a result of Defendant's conduct because they paid to own and enjoy 100% agave, ultra-premium, tequilas. Instead, Plaintiff and the Florida Subclass members received and overpaid for agave spirits enhanced by sugars other than those obtained from the *tequilana weber* blue variety agave grown in the requisite territory.

100. Defendant's failure to disclose, and active concealment of, the sugars used to ferment the Products, inclusive of the actual amount of Blue Weber agave ethanol actually used was material to Plaintiff and the Florida Subclass members.

101. Plaintiff and the Florida Subclass members have suffered ascertainable losses as a result of Defendant's misrepresentations and omissions about the Products. Had they been aware of the true nature of and composition of the Products, they either would have paid less for the Products or would not have purchased the Products. Plaintiff and the Florida Subclass members did not receive the benefit of their bargain due to Defendant's misconduct.

102. As a direct and proximate result of Defendant's violations of FDUTPA, Plaintiff and the Florida Subclass members have suffered injury-in-fact and actual damages.

103. Plaintiff and the Florida Subclass members are entitled to recover their actual damages under § 501.211(2), Fla. Stat. and attorneys' fees under § 501.2105(1), Fla. Stat.

104. Plaintiff and the Florida Subclass members have suffered and will continue to suffer irreparable harm if Defendant continues to engage in such deceptive, unfair, and unreasonable practices.

105. Plaintiff, on behalf of the Florida Subclass, requests that the Court award them actual damages and issue an order requiring Defendant to properly notify the Florida Subclass members of the true nature of how the tequila Products are made and the amount of Blue Weber agave used to make them, as well as award Plaintiff and Florida Subclass members' attorneys' fees; and any other just and proper relief available under FDUTPA.

106. Plaintiff, on behalf of the Florida Subclass, also seeks an injunction to prohibit Defendant from continuing to engage in the false, misleading, and deceptive advertising and marketing practices complained of herein.

## VIII. <u>CLAIMS FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully requests that the Court:

a. Certify the proposed Classes, appoint Plaintiff as the class representative, appoint Plaintiff's Counsel as Class Counsel, and make such further orders for the protection of Class Members as the Court deems appropriate;

b. Enjoin Defendant from engaging in the unlawful conduct alleged herein, and order such other injunctive relief that the Court deems just and proper;

c. Award compensatory damages to Plaintiff and the Class Members, including punitive damages, statutory damages, costs, and disgorgement in an amount to be determined at trial;

d. Award Plaintiff and Class Members pre-judgment and post-judgment interest, as provided by law,

e. Award Plaintiff and Class Members their reasonable attorneys' fees and costs as allowed by law;

f. Enter an order holding Defendant financially responsible for all Class notice and the administration of Class relief; and

g. Grant Plaintiff and the Class Members any other relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to *Fed. R. Civ. P.* 38(b), Plaintiff demands a jury trial for any and all issues triable by a jury.

Dated: October 31, 2025.

Respectfully submitted,

**RENNERT VOGEL MANDLER & RODRIGUEZ, P.A.**
*Counsel for Plaintiff and the Proposed Class*
Miami Tower, Suite 2900
100 S.E. Second Street
Miami, Florida 33131
Telephone (305) 577-4177
servicedanielmaland@rvmrlaw.com
servicerobertstein@rvmrlaw.com
servicesandramejia@rvmrlaw.com

*/s/ Daniel S. Maland*
Daniel S. Maland, Esq.
Florida Bar No. 114932
dmaland@rvmrlaw.com
Robert M. Stein, Esq.
Florida Bar No. 93936
rstein@rvmrlaw.com
Sandra E. Mejia, Esq.
Florida Bar No. 1026047
smejia@rvmrlaw.com